**Herbert MANGUS, Petitioner,**

**v.**

**Ron EDWARDS, Warden, Respondent.**

**No. 1:97 CV 1981.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 15, 1999.

David L. Doughten, Cleveland, OH, for Herbert Mangus, petitioner.

Lillian B. Earl, Office Of The Assistant, Attorney General, Laurence Snyder, Office Of The Attorney General, Cleveland, OH, for Ron Edwards, Warden, respondents.

## MEMORANDUM OPINION AND ORDER

NUGENT, District Judge.

This matter comes before the Court upon the Report and Recommendation of Magistrate Judge David S. Perelman. For the reasons stated below, the Report and Recommendation (Document # 14) is ADOPTED and the Petition for Writ of Habeas Corpus (Document # 1) is DENIED and the Petition is DISMISSED.

### Factual and Procedural Background

Petitioner, Herbert Mangus, filed this Petition for Writ of Habeas Corpus on July 30, 1997, challenging the constitutionality of his conviction for rape, pursuant to Ohio Rev. Code § 2907.02, in a March 1994 state jury trial. Petitioner names Ron Edwards, Warden of the Ross Correctional Institution, as Respondent. Petitioner was sentenced for a term of ten to twenty-five years.[1]

Petitioner appealed to the Court of Appeals of Ohio, Eighth District, raising the following assignments of error: (1) the evidence is constitutionally insufficient to sustain a conviction of rape in violation of R.C. § 2907.02 pursuant to count one of the indictment; (2) the trial court erred when it admitted out of court statements made by a witness, where no exception to Evid. R. 802 applied; and, (3) the appellant was not afforded effective assistance of counsel at trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. The court of appeals affirmed the conviction, but remanded the case to the trial court to correct an error in sentencing; the ten to twenty-five year sentence for rape is to run consecutive, not concurrent, to the eighteen month sentence for having a weapon while under disability.

Petitioner appealed the decision of the court of appeals to the Supreme Court of Ohio. In his Memorandum in Support of Jurisdiction, Petitioner argued three propositions of law: (1) where an accused does not use force or the threat of force and there is no evidence of such there can be no conviction of rape in violation of R.C. § 2907.02; (2) statements made with sufficient time to allow for reflective thought are inadmissible hearsay under Evid. R. 803; and, (3) failure to request a jury instruction for the lesser included offense of sexual battery where the facts mandate such an instruction constitutes ineffective assistance of counsel. On July 31, 1996, the Supreme Court of Ohio denied leave to appeal on the basis that the appeal did not involve any substantial constitutional question.

On July 30, 1997, Petitioner filed this Petition for Writ of Habeas Corpus, raising the following three grounds for relief:

A. Ground one: The evidence was insufficient to sustain a conviction of Rape in violation of the Fifth and Fourteenth Amendments.

Supporting FACTS (state briefly without citing cases or law): Viewing the evidence in a light most favorable to the state, there is no evidence that the petitioner forced intercourse upon the victim. The victim merely stated that the petitioner "put his penis in my vagina."

B. Ground two: The trial court allowed inadmissible hearsay in violation of the Sixth, Fifth and Fourteenth Amendments.

Supporting FACTS (state briefly without citing cases or law): The trial court allowed a witness to testify that the victim made a statement days after the incident regarding the petitioner's actions. This statement was improperly classified as an excited utterance.

C. Ground three: The petioner's [sic] trial counsel did not afford the petitioner effective assistance of counsel

---

**1.** Petitioner was also convicted and sentenced to eighteen months for the unrelated offense of having a weapon while under disability,

pursuant to OHIO REV. CODE § 2923.13. This conviction is not challenged in this action.

as guaranteed by the Sixth and Fourteenth Amendments.

Supporting FACTS (state briefly without citing cases or law): Trial counsel failed to request a lesser included offense instruction on the offense of sexual battery even though the evidence could only support a conviction of this lesser offense.

The following factual history is recited from the opinion of the state court of appeals. It is a reasonable determination of the facts and is consistent with the trial transcript, which the Court has reviewed, and, therefore, is entitled to a presumption of correctness, unless Petitioner shows that it is unreasonable by clear and convincing evidence. *See* 28 U.S.C. §§ 2254(d)(2); (e)(1).

On May 28, 1993, Elizabeth came home from school at 3:30. She told her mother about her day and was particularly excited about bowling with her class. Elizabeth changed her clothes and left the house to play with the children in the neighborhood at about 4:00. It was a warm day. Elizabeth was wearing shorts, a t-shirt and tennis shoes.

At approximately 4:30 Molley Allooh, who knew Elizabeth well, spoke with her briefly in the Alloohs' front yard. [Petitioner] lived next door to the Alloohs. Mrs. Allooh saw Elizabeth in [Petitioner's] yard as Mrs. Allooh went inside to care for her four children. An hour and a half later Mrs. Allooh was tending to her dinner on the grill when her son went to [Petitioner's] house to ask if he could retrieve the ball the boy had inadvertently sent into [Petitioner's] backyard. [Petitioner] came to the back gate to let Mrs. Allooh's son into the yard. Mrs. Allooh saw [Petitioner] and also Elizabeth following behind him. Elizabeth was shaking her hands as she did when she became agitated. Most strikingly, however, Mrs. Allooh noted that Elizabeth was wearing her shorts with both legs coming through one of the leg holes. Elizabeth had not been dressed as such earlier when Mrs. Al-looh had spoken with her. Mrs. Allooh ran to [Elizabeth's] home, about ten houses down the street, to have Mrs. Peura [Elizabeth's mother] come get her daughter. On her way back home, Mrs. Allooh passed Elizabeth walking in the direction of her own home.

Mrs. Peura asked Elizabeth several questions before deciding that the Lakewood police should be notified. Elizabeth has difficulty communicating and her mother testified that Elizabeth did not in fact tell her what happened on that day. On cross-examination, the defense asked if Elizabeth had talked to her mother on the day of the incident about what happened. Mrs. Peura responded that Elizabeth had not because it was very late by the time they came home from the hospital. On re-direct Mrs. Peura explained that Elizabeth told her later that [Petitioner] had touched her "back here," and had told her to be quiet. (TR. 235).

Investigator Lawrence Ambrose came to the house and interviewed Elizabeth. He testified that Elizabeth told him "that she was sitting on the couch with him [Petitioner], and that he showed her some photos of himself, and that she also said for awhile, she was holding a red ball, and that the man took her shorts off." (TR. 247). Elizabeth told Ambrose that the man touched her "butt" and indicated her buttocks, vagina and upper legs. (TR. 247). According to Ambrose's testimony, Elizabeth "pointed toward her vagina and she said 'hurt.'" (TR. 248). Furthermore, she told him "one time he yelled at her when she was making too much noise." (TR. 248). Ambrose transported Elizabeth to Lakewood hospital.

On a video taped deposition, played to the jury, Dr. Nelson testified that he performed an examination of Elizabeth on that evening and took samples from Elizabeth's body for the rape kit, which was sent for testing at the Bureau of Criminal Investigation ("BCI"). Dr.

Nelson testified from his written record of the examination. In his notes Dr. Nelson had written, "patient states that she was sexually penetrated and ejaculated on by a known person ." (Dep.9). Dr. Nelson saw what appeared to be semen on Elizabeth's introitus and clitoris and in a vaginal pool, located at the top of the vaginal canal. He noted some abrasions on the vaginal walls. Although Dr. Nelson could not state that the abrasions were fresh, he testified that the abrasions or tears, such as these, heal within forty-eight hours. Dr. Nelson also noted that the hymen was not intact. Elizabeth became uncooperative at the end of the examination so Dr. Nelson was unable to do a "wet prep," where the sample of the fluids from her vagina could be examined under a microscope for the presence of semen or spermatozoa. The samples taken by swabs and smears from the vagina, anus and mouth were sent to BCI. Dr. Nelson was asked by the prosecution if his findings were consistent with sexual penetration. He responded, "Yes." (Dep.33).

James Wurster from BCI testified that he performed tests on the samples sent to him from the physical examination of Elizabeth and also on the bed sheets and clothing articles recovered from [Petitioner's] house. Wurster found no traces of semen on any of the articles or from the samples taken by Dr. Nelson. Neither did Wurster find anything of significance in the scraping taken from Elizabeth's fingernails. Wurster testified that it is quite rare to find evidence from fingernail scrapings.

While Elizabeth was at Lakewood Hospital, [Petitioner] was arrested and his house was searched pursuant to a search warrant. Officer Beno transported [Petitioner] to the Lakewood jail and conducted a search of [Petitioner's] person at the jail. Beno testified that he noted fresh scratches on [Petitioner's] back, near the shoulder blade area which "appeared to be from somebody's fingernail." (TR. 363). Detective Robinson searched [Petitioner's] house and took as evidence bedding which had been described by Elizabeth as being a flower print. Robinson did not find any pictures of [Petitioner] which might have been described by Elizabeth as she told Investigator Ambrose. Nor did Robinson see a red ball during the search. However, Sergeant Fred Wellman testified to having seen a bowling ball in a bowling bag in a room on the second floor. This room had been locked but the police broke the hasp off of the padlock to gain entry. At the time Sgt. Wellman saw the bowling ball, its significance had not yet come to light in the investigation.

After Elizabeth's physical examination by Dr. Nelson, Detective Erhardt and Jefferey Corbacho, Elizabeth's school principal, conducted a brief interview of Elizabeth at the hospital. Corbacho was notified of the situation due to his ability to communicate well with Elizabeth. He testified that Elizabeth was "very upset and embarrassed" in the hospital room. (TR. 277). Elizabeth told Corbacho that she had taken off her clothes and that the man had touched her. She indicated her buttocks, chest and legs as the areas which were touched. Elizabeth explained that she saw the man's penis when he took off his clothes. Corbacho testified that Elizabeth was familiar with the words "penis" and "vagina" from the sex education taught at the school, and knew the difference between the two. Corbacho aksed what happened after the man took off his clothes. Elizabeth "said it hurt. And we asked where? and she again pointed between her legs." (TR. 283). Corbacho's testimony continued, "At the next point, Detective Erhardt asked, was he lying on top of you? The answer was yes. And what did you say? And she said it hurt and I said stop." (TR. 283).

Testimony was adduced from Officer Montague, on duty at the jail the night [Petitioner] was arrested, as to the comments made to the general prison

population by [Petitioner] that night. Montague overheard [Petitioner] telling fellow prisoners "that he gave a bowling ball to a little retarded girl and was receiving for payment fucks, and he still had nine more fucks coming for payment." (TR. 372–73).

Finally, [Petitioner] gave an oral statement to Detectives Erhardt and Incze the day after his arrest. After signing a form indicating that he was familiar with his rights, [Petitioner] told the detectives "that he wanted to set the record straight about the retard that wanted to have sex, that was having sex with every other boy in the neighborhood." (TR. 435). [Petitioner] told the detectives that he offered to sell a bowling ball to Elizabeth for twenty dollars, that she followed him upstairs while he was using the bathroom and grabbed his penis. He claimed to have rejected her advance. After he returned to the first floor of his house he realized that she had gone upstairs. When he got to his bedroom [Petitioner] saw Elizabeth lying naked on the bed. [Petitioner] stated that he then slapped her on the buttocks and told her to go home. After Detective Erhardt asked him how he could explain the presence of semen on Elizabeth, [Petitioner] offered the story that some must have come out of his penis when she was stroking it in the bathroom and that she then went to the bedroom and fingered herself. [Petitioner] denied having sex with Elizabeth. When the detective told [Petitioner] that Elizabeth had said that [Petitioner] had had sex with her and it hurt and she had told him to stop, [Petitioner] told the detectives that he was ready to go back to his cell and watch t.v. He asked them, "how much time do you think I am going to get for this? * * * six months or a year ought to do it." (TR. 440). [Petitioner] then laughed and returned to his cell.

The state rested its case after the presentation of the foregoing testimony and evidence. [Petitioner] testified on his own behalf. He admitted to bragging in the jail about the incident but said it was just a joke, then denied stating the details of the sex for the bowling ball transaction. [Petitioner's] testimony was contradictory, belligerent and wholly lacking in credibility, from this Court's view. The jury must have thought so as well.

*Ohio v. Mangus*, No. 68679, 1996 WL 50824, at *1–*3 (Ohio Ct.App. Feb. 8, 1996).

After three extensions of time, Respondent filed a Return of Writ on November 25, 1997. A second Return of Writ was filed by Respondent on April 7, 1998. The transcript of the state court proceeding was filed on January 7, 1999. Per Local Rule 72.2(b), this matter was referred to Magistrate Judge Perelman. The Magistrate Judge issued a Report and Recommendation on January 14, 1999, recommending that the petition be dismissed with no further proceedings. On January 25, 1999, Petitioner filed timely objections to the Magistrate Judge's Report and Recommendation.

### Standard of Review for a Magistrate Judge's Report and Recommendation

The applicable district court standard of review for a magistrate's report and recommendation depends upon whether objections were made to that report. When objections are made to a report and recommendation of a magistrate judge, the district court reviews the case *de novo*. FED. R. CIV. P. 72(b) provides this standard of review. It states, in pertinent part:

The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Accordingly, because Petitioner filed timely objections to the Magistrate Judge's Report and Recommendation, this Court reviews the Report and Recommendation *de novo*. It is important to note that the standard of review for an opposed magistrate judge's report and recommendation (*de novo* review) is distinct from the standard of review for a state court's decision under 28 U.S.C. § 2254, which is discussed below.

### Discussion

#### I. Standard of Review

Because Petitioner filed his federal habeas application after April 24, 1996, the Anti–Terrorism and Effective Death Penalty Act (AEDPA) applies to his application. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Under AEDPA, a federal court "shall entertain an application for a writ of habeas corpus in [sic] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A federal court shall not grant the application for any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Federal review of whether a state court's decision is "contrary to" Supreme Court precedent, either by the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, or through application of "pure law"—a rule clearly established by the Supreme Court—is guided by § 2254(d)'s "contrary to" clause. However, to date, the Sixth Circuit has declined to decide what "specific approach" lower courts should employ when reviewing a state court's determination of "pure law." *See Nevers v. Killinger*, 169 F.3d 352, 358–61 (6th Cir.1999); *Harpster v. Ohio*, 128 F.3d 322, 326–27 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998).[2]

Federal review of a state court's application of mixed law and fact is determined by § 2254(d)'s "unreasonable application of" clause. *Nevers*, 169 F.3d at 361. The Sixth Circuit has recently articulated a standard that "combines the not entirely consistent standards enunciated by the First and Fifth Circuits." *Nevers*, 169 F.3d at 378 (Bright, J., concurring).

The Fifth Circuit's approach to questions of mixed law and fact dictates that "an application of law to facts is *unreasonable* only when it can be said that reasonable jurists considering the question would be of one view that the state court decision is incorrect. In other words, we grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among jurists." *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied*, 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997). The Fourth and Eleventh Circuits have adopted the "reasonable jurist" test for mixed questions of law and fact. *See Green v. French*, 143 F.3d 865, 870, 873 (4th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999); *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999).

---

**2.** The Court need not decide today which "specific approach" should be undertaken when the "contrary to" clause of § 2254(d)(1) is implicated; the state court's decisions reviewed herein are fact-intensive and involve mixed questions of law and fact and, therefore, the decisions are reviewed under the "unreasonable application of" clause. *See Nevers*, 169 F.3d at 369–61.

The First Circuit explicitly rejected the *Drinkard* court's "reasonable jurist" test. *See O'Brien v. Dubois*, 145 F.3d 16, 25 n. 7 (1st Cir.1998). The First Circuit gave two reasons: "First, the test is circular inasmuch as it defines 'unreasonable application' by reference to what 'reasonable jurists' think about an issue. Second, and more importantly, we regard the test as too deferential because it focuses on the reasonableness of individual judges, more so than on the reasonableness of judicial decisions. Given that reasonable judges occasionally make unreasonable decisions, the *Drinkard* court's interpretation of the 'unreasonable application' clause could drain it of much of its practical meaning." *Id.* (citation omitted). The *O'Brien* court stated that the following standard must be met before a federal court should issue a writ: "[T]he state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *Id.* at 25.

The Seventh Circuit has promulgated several different standards. *See Lindh v. Murphy*, 96 F.3d 856, 871 (7th Cir.1996) (en banc), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (a federal court must "take into account the care with which the state court considered the subject."); *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997) ("The statutory 'unreasonableness' standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes."); *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997) (specifically rejecting the *Lindh* court's "care with which the state court considered the subject" test and stating that the appropriate question is "whether the determination is at least minimally consistent with the facts and circumstances of the case.").

The Sixth Circuit had, previous to the decision in *Nevers*, adopted the Fifth Circuit's "reasonable jurist" test. The Sixth Circuit stated that a "district court could

find the state court determinations unreasonable 'only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect. In other words, we can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among jurists.'" *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir.1998), *reh'g en banc denied*, Jan. 21, 1999 (quoting *Drinkard*, 97 F.3d at 769).

However, recently, the Sixth Circuit "state[d] as well our agreement with the standard enunciated by the First Circuit ...." *Nevers*, 169 F.3d at 361-62. The *Nevers* court recognized that the First Circuit had specifically rejected the "reasonable jurist" test, but decided that "the two are not mutually exclusive; rather, both standards can be employed to aid in arriving at the correct answer to the question of 'unreasonableness.'" *Id.* Thus, the Sixth Circuit's new hybrid rule states that "the unreasonableness of a state court's application of clearly established Supreme Court precedent will not be 'debatable among jurists,' *Drinkard*, 97 F.3d at 769, if it is 'so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes,' *O'Brien*, 145 F.3d at 25." *Id.*

The concurrence in *Nevers* disagreed with the amalgamation of the two standards, arguing that the two standards are "not entirely consistent," that the new standard "creates too rigid a bar for relief," and cautioning the majority that the new standard "approaches a suspension of the Writ of Habeas Corpus," which would be in contravention of Article I, Section 9, of the United States Constitution. *Nevers*, 169 F.3d at 378.

However, the opinion merely defines the "reasonable judge" for purposes of reviewing a state court's determination of mixed questions of law and fact. This interpretation is preferred considering that one "panel of [the Sixth Circuit] cannot overrule the decision of another panel. The

prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or [the Sixth Circuit] sitting en banc overrules the prior decision." *United States v. Smith,* 73 F.3d 1414, 1418 (6th Cir.1996) (quotation omitted). The *Herbert* court, while adopting the Fifth Circuit approach, did not specifically reject the First Circuit test. Thus, in the Sixth Circuit, it appears that the Fifth Circuit's "reasonable jurist" test has been fleshed-out by the First Circuit's "so offensive, arbitrary, devoid of record, and thus outside the universe of plausible and credible outcomes" test.

In addition to this new standard for reviewing a state court's determination of law and facts, the Sixth Circuit has determined that the phrase "as determined by the Supreme Court of the United States" means that a "district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law." *Herbert,* 160 F.3d at 1135 (citation omitted). *Compare Neelley,* 138 F.3d at 922–23 (determining that the first step under § 2254 is to determine the "clearly established" law at the relevant time, as guided by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)—which held that new rules should not be applied retroactively in reviewing habeas applications), *with Green,* 143 F.3d at 873 *and Drinkard,* 97 F.3d at 767 (declining to view the term "clearly established federal law" as a codification of the *Teague* doctrine). *But see O'Brien,* 145 F.3d at 25 ("To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue.").

## II.   Procedural Default

Respondent concedes that Petitioner properly exhausted his state remedies. However, quizzically, the Respondent next asserts that "since [Petitioner's] claims were adjudicated on the merits in state court those claims cannot be heard by this Court." Respondent seems to assert that Petitioner is required to exhaust the remedies available in state court, but, once he does, he cannot be heard by this Court. Section 2254(d)(1) does not give state court decisions a *res judicata* effect. Such an interpretation of the section would require a reader to ignore more than half of the section's words. Further, Congress considered, and rejected, a proposal that would have abolished the jurisdiction of federal courts to review questions of federal issues. *See* 141 CONG. REC. S7849 (1995) (defeat of the Kyl Amendment). Petitioner has exhausted his state remedies and, thus, has not procedurally defaulted on his claims—to which the Court now turns.

## III.   Petitioner's Legal Claims

Petitioner raises three claims under 28 U.S.C. § 2254:(1) the evidence was insufficient to sustain a conviction of rape; (2) the trial court erred by permitting inadmissible hearsay; and, (3) trial counsel was ineffective in failing to request a lesser included offense instruction.

## A.   Sufficiency of Evidence

■   Petitioner contends that there was insufficient evidence to convict him of rape because the state presented no evidence that any force or threat of force was used; rather, the victim merely stated that the Petitioner "put his penis in my vagina." Petitioner's contention is without merit.

■   In a challenge to a state criminal conviction brought under 28 U.S.C. § 2254, the "clearly established" standard for reviewing the sufficiency of evidence to support that criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citation omitted).

The court of appeals rejected Petitioner's insufficient evidence claim, finding "substantial evidence from which the jury could have found beyond a reasonable doubt that [Petitioner] raped Elizabeth by force." *Mangus*, 1996 WL 50824, at \*4. The court of appeals determined that the evidence, "viewed in a light most favorable to the prosecution, could have easily convinced a jury to find the element of force proven beyond a reasonable doubt." *Id.* The decision of the court of appeals was based on the following evidence: Elizabeth's statement, while pointing to her vagina, that Petitioner hurt her; Elizabeth's statement that Petitioner yelled at her for making too much noise and told her to be quiet; Elizabeth's affirmative answer to the question of whether Petitioner was lying on top of her, to which she added that she told Petitioner it hurt and to stop; the abrasions found on Elizabeth's vaginal walls; the scratches found on Petitioner's back; and the disparity in the parties relation to each other—Elizabeth was seventeen years old and had a mental capacity of a three or four year old, while Petitioner was forty-nine years old. *Id.*

Because the mixed factual findings and legal conclusions of the court of appeals are supported by the record and satisfy the clearly established *Jackson* standard, the court's application of law and facts is neither offensive to legal precedent, devoid of record support, nor arbitrary, and thus it is well within the universe of plausible and credible outcomes. Petitioner's first ground for relief is denied.

B. Improper Admission of Hearsay Testimony

Petitioner argues that the trial court allowed inadmissible hearsay into evidence in violation of the Fifth, Sixth, and Fourteenth Amendments. Specifically, Petitioner asserts—as he has in his direct appeals—a violation of the Sixth Amendment's Confrontation Clause. The trial court allowed, over Petitioner's objection, Mrs. Peura's testimony that she had been told by her daughter, Elizabeth, that Petitioner "told her to be quiet."

The court of appeals analyzed Petitioner's claim as follows:

There was not an opportunity for Elizabeth to have time alone with her mother until the next day.

We can not assume a time period in which to place these statements made by Elizabeth to her mother. Therefore, we are unable to review the applicability of Evid.R. 803(2), the excited utterance hearsay exception, to these statements. We can not reverse the trial court's decision to admit the testimony without further proof that the admission was somehow an abuse of discretion.

Furthermore, the testimony that Elizabeth had said that [Petitioner] told her to be quiet during the incident was corroborated by the testimony of Ambrose, one of the first officers to speak with Elizabeth upon arrival at her home. Also, the quantum of evidence without the statements made by Mrs. Peura sufficiently supports the rape conviction. We find that [Petitioner] was not prejudiced by the admission of the hearsay statements, regardless of whether or not the excited utterance exception was applicable.

*Mangus*, 1996 WL 50824, at \*5.

The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403–05, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." If read literally, "the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Thus, the Supreme Court provides a two-part approach to Confrontation Clause issues: "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliabil-

ity.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. 2531.

Particularized guarantees of trustworthiness must be shown from the totality of only those circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho v. Wright,* 497 U.S. 805, 819, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Thus, corroborating evidence may not support a finding that the hearsay statement bears "particularized guarantees of trustworthiness" because, "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* at 822, 110 S.Ct. 3139.[3]

■ In the case at hand, the trial court ruled that Elizabeth was not competent to testify (TR. 130–31); a ruling not at issue in this matter. Elizabeth was therefore unavailable as a witness. Respondent argues that Petitioner "cannot show any violation of evidentiary rules which would rise to the level of fundamental fairness."[4] However, an accused shall enjoy the right to be confronted with the witnesses against him, and the burden is on the state, as the proponent of evidence presumptively barred by the hearsay rule and the Confrontation Clause, to carry its burden of proving Elizabeth's statements bore the sufficient indicia of reliability to withstand scrutiny under the Clause. *See Wright,* 497 U.S. at 816, 110 S.Ct. 3139.

The court of appeals decided that the statement was sufficiently reliable because "the testimony that Elizabeth had said that [Petitioner] told her to be quiet during the incident was corroborated by the testimony of Ambrose .…" *Mangus,* 1996 WL 50824, at *5. However, as discussed above, the reliability of a hearsay statement must be judged by its "inherent trustworthiness" and "not by reference to other evidence at trial." *Wright,* 497 U.S. at 822, 110 S.Ct. 3139.

Finally, the court of appeals applied a harmless error review, determining that "the quantum of evidence without the statements made by Mrs. Peura sufficiently supports the rape conviction." *Mangus,* 1996 WL 50824, at *5. However, instead of using the clearly established *Chapman* standard to decide whether the claimed error was "harmless beyond a reasonable doubt," *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the court of appeals used a "quantum of evidence" standard to decide that the error was harmless.[5]

---

**3.** The Supreme Court identified a number of factors that properly relate to whether hearsay statements made by a child witness in child sexual abuse cases are reliable: spontaneity and consistent repetition; mental state of the declarant; use of terminology unexpected of a child of similar age; lack of motive to fabricate. *Wright,* 497 U.S. at 821–22, 110 S.Ct. 3139. Because this Court decides that the admission of the hearsay statement is harmless error, *see infra,* the Court does not decide if the statement had sufficient indicia of reliability based on these factors.

**4.** Petitioner did not assert a due process claim. When a claim is made that trial error "so infected the trial with unfairness as to make the resulting conviction a denial of due process," a habeas court's "narrow" review is to ask if the trial error "constitutes a failure to observe that fundamental fairness essential to the very concept of liberty." *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (quotations omitted). The due process fundamental fairness standard is not applicable when a petitioner asserts that "the State has denied [him] the benefit of a specific provision of the Bill of Rights .…" *Id.* at 643, 643 n. 15, 94 S.Ct. 1868. *See also Darden v. Wainwright,* 477 U.S. 168, 181–82, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

On collateral habeas review, a federal court employs a more lenient harmless error standard (the *Brecht/O'Neal* standard) than the standard which state courts must employ—the *Chapman* standard. Under the *Brecht/O'Neal* standard, a federal habeas court "may grant relief based on trial error only when that error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Calderon v. Coleman,* — U.S. —, 119 S.Ct. 500, 503, — L.Ed.2d — (1998) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) and *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). *See also O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (qualifying the *Brecht* standard by holding that when a federal habeas court finds itself in "grave doubt" after applying the harmless error standard, the error is not harmless and petitioner must win).

As a threshold inquiry, the federal habeas court must establish whether the error being considered is a trial error or a structural error. *Brecht,* 507 U.S. at 629–30, 113 S.Ct. 1710. If the error is structural, harmless error analysis does not apply; if the error is a trial error, the federal court must apply the *Brecht/O'Neal* standard. *Id.* Structural errors are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* (quotation omitted). Structural errors require automatic reversal because "they infect the entire trial process." *Id.* (citation omitted). The Supreme Court has found structural errors in limited circumstances.[6]

"Trial error 'occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may ... be quantitatively as-

sessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" *Id.* (quoting *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). The alleged error in this case—the admission at trial, over objection, of a certain statement made by Elizabeth to her mother—is a trial error subject to harmless error review. *See Wright,* 497 U.S. at 823, 110 S.Ct. 3139 (an error in the admission of a hearsay statement is subject to harmless error review).

After the AEDPA amended § 2254, the question for federal habeas courts assessing the harmlessness of constitutional error is whether the *Brecht/O'Neal* standard continues to be the appropriate standard for harmless error review. In resolving this question, the Sixth Circuit recently held that "when the issue before the federal habeas court is the state court's finding of harmless error, the test set out by the Supreme Court in *Kotteakos* and explicitly reiterated in *Brecht* quite precisely captures Congress's intent as expressed in AEDPA and, therefore, continues to be applicable.... [I]t is the habeas petitioner's burden to demonstrate that the state court's finding that the error was harmless beyond a reasonable doubt—the *Chapman* standard—was outside the realm of plausible credible outcomes, and therefore resulted from an unreasonable application of *Chapman.*" *Nevers,* 169 F.3d at 371 (citations omitted).

Because placing this burden on the habeas petitioner is contrary to the Supreme Court's ruling in *O'Neal,* this Court must assume that the burden shifting is part of the heightened deference that is due to state court decisions under AEDPA. *See O'Neal,* 513 U.S. at 444–45, 446–47, 115

---

6. *See Nevers,* 169 F.3d at 369 (citing *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (lack of impartial trial judge); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (total deprivation of the right to counsel); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (the right to self-representation at tri-

al); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (right to a public trial); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (unlawful exclusion of grand jurors of defendant's race); *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (erroneous reasonable doubt instruction)).

S.Ct. 992 (Thomas, J., dissenting) ("Under the majority's rationale ... the habeas petitioner need not prove causation at all; once a prisoner establishes error, the government must affirmatively persuade the court of the harmlessness of that error."). This appears a reasonable assumption considering the Sixth Circuit's presupposition that if the habeas petitioner is able to meet his burden of establishing harmless error under *Brecht/O'Neal*, then he "will surely have demonstrated that the state court's finding that the error was harmless beyond a reasonable doubt ... was outside the realm of plausible credible outcomes, and therefore resulted from an unreasonable application of *Chapman*." *Nevers*, 169 F.3d at 371.

Thus, Sixth Circuit harmless error review, under AEDPA, requires the federal habeas court to determine if the *Chapman* standard was properly applied by the state court; and if it was properly applied, the court must decide if *petitioner* established that the state court's application of *Chapman* was unreasonable (in the light of *Brecht/O'Neal*). *Nevers*, 169 F.3d at 372.

However, when a state court fails to apply, or misinterprets, the proper standard as determined by the Supreme Court, the state court's decision is "an unreasonable application of" clearly established Supreme Court precedent. *See Davis v. Kramer*, 167 F.3d 494, 500, 502 n. 8 (9th Cir.1999) (stating that it is an "unreasonable application of clearly established federal law" when the state court fails to apply, or simply misinterprets, a legal principle enunciated by the Supreme Court); *Herbert*, 160 F.3d at 1135 ("[W]hether the state court's treatment was 'unreasonable' ... requires courts to take into account the care with which the state court considered the subject.") (quoting *Lindh*, 96 F.3d at 870–71); *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir.1998),

*cert. denied,* —— U.S. ——, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998) (holding that it could not review a state court's application of "clearly established law" when the court does not give a rationale for its adverse determination; in such case the federal court must "independently ascertain whether the record reveals a violation"); *O'Brien*, 145 F.3d at 24 (the habeas court must determine "whether the state court's use of (or failure to use) existing law ... involved an 'unreasonable application' of Supreme Court precedent."); *Green*, 143 F.3d at 879 (a state court decision represents an "unreasonable application of" clearly established federal law when, *inter alia*, "that decision fails to apply the principle of a precedent in a context where such failure is unreasonable."); *Neelley*, 138 F.3d at 923–24 (stating that a state court decision is "contrary to" clearly established Supreme Court case law when it "fails to apply the correct legal principles to decide a case.").[7] Under these circumstances, in lieu of returning the matter to the state court to apply the proper test, the federal habeas court "shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

Based on pre-AEDPA Supreme Court case law, the proper harmless error review for a federal habeas court to apply is the *Brecht/O'Neal* standard. *See Calderon*, —— U.S. ——, 119 S.Ct. 500, —— L.Ed.2d —— (reversing the Ninth Circuit's use, on collateral review, of a less deferential harmless error standard than *Brecht/O'Neal*); *California v. Roy*, 519 U.S. 2, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (vacating the Ninth Circuit's use of a "special" harmless error standard on collateral review, and directing that the *Brecht/O'Neal* standard be employed); *O'Neal*, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d

---

7. While some of the circuits have determined that a state court decision is "contrary to" Supreme Court precedent when the state court failed to apply the correct legal principles, this Court follows those circuits that decide such a decision is an "unreasonable application of" Supreme Court precedent; in this case, the state court of appeals unreasonably applied a "quantum of evidence" harmless error standard, instead of the proper *Chapman* standard.

947 (vacating the Sixth Circuit's ruling that the habeas petitioner must bear the "burden of establishing" whether the error was prejudicial under the *Brecht* standard).

The subtle, but important, difference between the *Brecht/O'Neal* standard applied in the context of reviewing a state court's proper application of the *Chapman* standard, and the *Brecht/O'Neal* standard applied in a case such as this where the state court did *not* apply *Chapman*, is where the burden of persuasion falls in establishing the harmlessness of the error.

If the state court had applied *Chapman*, the Sixth Circuit places the burden on the petitioner to show that the state court's application of *Chapman* was unreasonable (in the light of *Brecht/O'Neal*). *Nevers*, 169 F.3d at 371. However, because the state court did not apply *Chapman*, the prevailing Supreme Court standard dictates that the burden is *not* on the petitioner to establish that the error was prejudicial. *See O'Neal*, 513 U.S. at 436–40, 115 S.Ct. 992.

Rather, the inquiry on habeas "does not involve a judge who shifts a 'burden' to help control the presentation of evidence at trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it conceptually clearer for the judge to ask directly, 'Do I, the judge, think that the error substantially influenced the jury's decision?' than for the judge to try to put the same question in terms of the proof burdens (*e.g.*, 'Do I believe the party has borne its burden of showing ...?')." *Id.* at 436–47, 115 S.Ct. 992.

The federal habeas court must (1) evaluate the error in the context of the entire record; (2) ask whether the constitutional trial error at issue had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 631, 113 S.Ct. 1710; and, (3) if the habeas court "is in grave doubt as to the harmlessness of the error that affects substantial rights,

it should grant relief," *O'Neal*, 513 U.S. at 445, 115 S.Ct. 992. *See Calderon*, 119 S.Ct. at 504 (Stevens, J., dissenting).

■ Having exhaustively examined the record, this Court finds, without doubt, that the claimed constitutional error at issue did not have a "substantial and injurious effect or influence on the jury's verdict." *Calderon*, 119 S.Ct. at 503. First, the statement that Mrs. Peura repeated was similar to a statement that Elizabeth made to Investigator Ambrose (TR. 248). On the one hand, the testimony that Petitioner told Elizabeth to be quiet was not a novel or singular revelation. On the other, the repeating of this testimony was not so egregious and did not happen so often as to cause a concern about due process and fundamental fairness. Second, as this statement is relevant to the element of force, it was only one of many statements that implicated the use of force by Petitioner: Elizabeth told Detective Ambrose that Petitioner hurt her and yelled at her for making too much noise; she told Mr. Corbacho that Petitioner had hurt her; she told Detective Erhardt that Petitioner was lying on top of her and that it hurt and to stop; Officer Beno found fresh scratches on Petitioner's back; and, an inference of Petitioner's and Elizabeth's relative mental and physical power can be made from Petitioner's age of forty-nine and Elizabeth's mental age of three or four years old. Third, the evidence as a whole is sufficient for Petitioner to have been found guilty by a jury of his peers.

C. Ineffective Assistance of Counsel

Petitioner claims that trial counsel was ineffective in failing to request a lesser included offense instruction on sexual battery. Petitioner argues that while there was evidence of sexual contact, there was no evidence of threat of force, and therefore "had trial counsel requested an instruction on the lesser included offense of sexual battery, the jury could have returned a guilty verdict for sexual battery rather than rape."

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, it is clearly established that Petitioner must (1) show that counsel's performance was deficient, *i.e.*, that it fell below an "objecive standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and, (2) demonstrate that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.*

The court of appeals rejected Petitioner's claim that he was afforded less than competent legal counsel at the trial level, finding the failure to request an instruction on the offense of sexual battery "was not a violation of defense counsel's duty in representing [Petitioner]." *Mangus*, 1996 WL 50824, at *5–*6. The court of appeals determined that:

> Given the evidence of this case, [Petitioner] was not entitled to a jury instruction on sexual battery as a lesser included offense of rape where he denied any sexual conduct with Elizabeth, and the jury, considering such defense, could not reasonably have disbelieved the State's evidence of force and purposeful sexual conduct, and at the same time, reasonably believed that non-forcible sexual conduct took place under circumstances where [Petitioner] knew that Elizabeth's ability to appraise the nature of or to control her own conduct was substantially impaired. In order to support an instruction on sexual battery, on the facts of this case, the jury would have had to disbelieve all testimony from both defense and prosecution and concoct its own version of the incident. In that case, the jury could not be said to be reasonable in its beliefs and the instruction would still not be justified.
>
> Trial counsel did not violate any substantial duty in the failure to request an

instruction which was not justified under the facts in evidence. [Petitioner's] third assignment of error is overruled.

*Mangus*, 1996 WL 50824, at *6.

■ In his objections to the Magistrate Judge's Report and Recommendation, Petitioner now admits that "there was evidence of sexual contact." However, throughout the trial, as revealed by the transcript, Petitioner said that he "didn't engage in any sex, in any way with her." (TR. 527). Petitioner cannot now admit to sexual contact in order to receive habeas relief. Petitioner's trial defense strategy and tactics precluded a lesser included offense instruction; he can neither be found to have had ineffective assistance of trial counsel nor, at this late date, change his defense strategy when the fruits of those tactics turn sour.

Because the mixed factual findings and legal conclusions of the court of appeals are supported by the record and satisfy the clearly established *Strickland* standard, the court's application of law and facts is neither offensive to legal precedent, devoid of record support, nor arbitrary, and thus it is well within the universe of plausible and credible outcomes. Petitioner's third ground for relief is denied.

### Conclusion

The Court has reviewed Magistrate Judge Perelman's Report and Recommendation *de novo* and has considered all of the pleadings and filings of the parties in the light of 28 U.S.C. § 2254. Consistent with the preceding analysis, the Report and Recommendation (Document # 14) is ADOPTED and the Petition for Writ of Habeas Corpus (Document # 1) is DENIED and the Petition is DISMISSED.

Further, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and there is no basis upon which to

issue a certificate of appealability. 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b).

IT IS SO ORDERED.